# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| 29 MAIN STREET, LLC,<br>　　　Plaintiff, | No. 3:19-cv-2003 (SRU) |
| v. |  |
| UNITED STATES POSTAL SERVICE,<br>　　　Defendant. |  |

## <u>RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>

For roughly a half-century, the New Milford post office has occupied a prime location on the New Milford town green.  This matter concerns a purchase option in the government's 1969 agreement to lease a substantial portion of the property.  Lessee, defendant, and counterclaim plaintiff United States Postal Service ("USPS") asserts the purchase option was valid at the time the government attempted to exercise it, that the purchase option was validly exercised, and that the purchase option entitles the government to the entire property.  Property owner, plaintiff, and counterclaim defendant 29 Main Street, LLC ("29 Main LLC"), maintains that the purchase option has expired, was superseded, or is impossible to satisfy.  On that basis, 29 Main LLC has refused to convey title to the property and brought this declaratory judgment action.  USPS counterclaimed, seeking specific performance.  Both parties now move the Court for summary judgment on their claims.

For the reasons that follow, I **deny** summary judgment to 29 Main LLC and **grant** summary judgment to USPS.

I.      **Background**

   A.  Factual Background

   Plaintiff 29 Main LLC owns a property known as 29 and 37 Main St., New Milford, Connecticut ("the subject property").  29 Main LLC's Rule 56 Stmt., Doc. No. 33-2, at 1 ¶ 1. The subject property constitutes a single tax parcel.  *Id*.  It contains a brick building consisting of a first floor, a basement, a platform, and a loading ramp.  *Id*.  Since 1969, USPS has leased some or all of the subject property for use as the New Milford Post Office.

   1.  *The Parties and Their Predecessors and Successors in Interest*

   In 1969, the United States Post Office Department ("P.O.D."), predecessor of the USPS, negotiated and signed the first of two leases at issue with commercial builder Marvin Gold ("Gold") for the majority of the subject property.  In 1971, pursuant to the Postal Reorganization Act, USPS succeeded the Post Office Department.  *See* 39 U.S.C. § 201.

   In 1984, Gold passed away; thereafter, his estate conveyed the subject property and assigned USPS's lease to Milford Green Associates.  USPS's Rule 56 Stmt., Doc. No. 34-2, at 5 ¶ 22-23.

   In 1988, USPS executed a short-form lease with Milford Green Associates for the balance of the property.  Thereafter, in 1989, Milford Green Associates conveyed the property and assigned both leases to Camillo M. Santomero, III ("Santomero").  *Id.* at 6 ¶ 30-31.

   In 2000, USPS executed the second of the two leases at issue— a long-form lease for the balance of the property— with Santomero.  *Id.* 6 ¶ 33.  Santomero then conveyed the property and assigned both leases to 29 Main LLC, an entity for which he was Managing Member.  *Id.* at 8 ¶ 44; Doc. No. 32-16.  As a result, 29 Main LLC, successor-in-title to contracting parties Gold and Santomero, is the current owner and lessor of the property.

2. *The 1969 "Main Space" Lease Agreement*

In 1968, Gold, a builder with experience owning and leasing post offices, bid on the

opportunity to buy a supermarket owned by First National Stores, Inc. ("First National") on New

Milford's Main Street for use as a post office.  USPS's Rule 56 Stmt., Doc. No. 34-2, at ¶ 1; *see*

*also* Lease Bidder's Qualifications, Doc. No. 32-1.

On September 7, 1968, Gold submitted his bid to lease the First National property ("1968

Agreement to Lease").  Doc. No. 32-4.  In the 1968 Agreement to Lease, Gold agreed to lease

the premises "for postal purposes," contingent on the government's approval of "the completed

building and/or any contemplated improvements, additions, repairs or remodeling."  *Id.* at 1 ¶ 1.

The legal description of the property to be leased substantially described the First National

property, but it "except[ed]" 1,975 square feet from the first floor and 10,248 square feet from

the basement as "Areas that will not be used for final occupancy by [the Post Office

Department]."  *Id.* at 1 ¶ 2.  The lease provided for an initial term of twenty years followed by

six five-year terms, at a rate of $27,875.00 annually. *Id.* at 1 ¶ 1.

The 1968 Agreement to Lease expressly incorporated by reference several additional

paragraphs.  *Id.* at 3 ¶ 5.  One of those, Paragraph 10, provided a purchase option: "In

consideration of the award of this lease contract, the Government shall have the option to

purchase the fee simple title to the leased premises, including the underlying land" at the prices

specified in the contract.  *Id.* at 6 ¶ 10.  Paragraph 11 provided that "[t]he rental rates indicated in

Paragraph 1 and the repurchase options in Paragraph 10, Page 4 are valid only if the property

owned by First National Stores, Inc. at 37 Main Street, New Milford, Connecticut [could be

acquired] at a price not to exceed $150,000."  *Id.* at 7 ¶ 11.

Shortly thereafter, on September 9, 1968, Gold submitted his qualifications to support the

bid for the federal contract specified as the Main Office post office in New Milford, Connecticut.

Post Office Department's Lease Bidder Qualifications, Doc. No. 32-1, at 1.  On September 11, 1968, USPS secured an option to buy the subject property from First National for no more than $150,000.  Option to Purchase Land, Doc. No. 32-5.

On September 27, 1968, USPS accepted Gold's bid as proposed in the Agreement to Lease.  Agreement to Lease, Doc. No. 32-4, at 8.

On September 30, 1968, USPS assigned its option to purchase the subject property to Gold.  Option to Purchase Land, Doc. No. 32-5.

On December 19, 1968, Gold bought the First National property for $150,000.  Doc. No. 32-2 at 3.[1]  He began remodeling it for use as a post office.

On October 19, 1969, the New Milford Postmaster received authorization from the Post Office Department that the renovation satisfied the agency's requirements and invited the postmaster to move into the new New Milford Post Office at 37 Main St., New Milford, Connecticut.  Doc. No. 32-3.

On December 2, 1969, the Post Office Department executed a lease with Gold to rent the agreed-upon portion of the former First National property ("1969 Main Space Lease").  Doc. No. 32-6, at 1.  The terms in the 1969 Main Space Lease mirrored those set forth in the 1968 Agreement to Lease: an initial lease period of twenty years and six additional five-year terms, for a total of fifty years of fixed annual rent of $27,875.00, *id.* at 1 ¶ 3-4; a substantially similar legal description of the leased premises, *id.* at 1 ¶ 2; and an identical purchase option, *id.* at 7 ¶ 18.

---

[1] The conveyance of title from First National to Gold does not indicate the price Gold paid for the property. However, no party disputes that Gold purchased the property for $150,000.  *See* 29 Main LLC's Stmt. of Undisputed Material Facts Pursuant to Local Rule 56(a)(2) Submitted in Opp'n to USPS's Mot. for Summary Judgment, Doc. No. 38-2, at 2 ¶ 3 (admitting that Gold purchased the property for $150,000).

The premises leased by USPS in 1969, as described in Paragraph 2, did not encompass the entire building.  In detail, pursuant to the 1969 Main Space Lease, USPS leased the following property:

> All that certain land, containing approximately 48,365 square feet having a frontage on Main St. of 168.22'; a southerly bound of 307' more or less; a northerly bound of 306' more or less; a rear bound in two segments of 88' more or less and 74.5' more or less, all as shown on drawing BOS-5 dated 11/20/67; *excepting therefrom* the first floor building area of about 1975 sq. ft. as shown on drawing BOS-6, 11/20/67 as "Space not Req'd for P.O.D. use", and further excepting therefrom basement area of 10,248 sq. ft. as shown on drawing BOS-7 as "Areas that will not be used for final occupancy by P.O.D. but will be subject to work incidental to supplying any services for the remodeled bld'g", including a one-story and basement brick building providing approximately 9390 sq. ft. of net interior first floor area, basement providing approximately 1148 sq. ft. of space with platform and ramp of approximately 1470 sq. ft., exclusive use of paved driveway, parking and maneuvering area of approximately 31,271 sq. ft. and sidewalks and landscaped areas of approximately 3690 sq. ft. located at 37 Main Street in New Milford, Litchfield County, CT.

Doc. No. 32-6, at 1-2 ¶ 2 (emphasis added).[2]  The 1969 Main Space Lease pertained to roughly 9,000 square feet of the first floor, 1,000 square feet of the basement, and 1,500 square feet of outside improvements; and it excluded certain spaces on the first floor and in the unfinished basement of the building.  Taken together, USPS leased "approximately 80% of the first floor," "less than 10% of the basement," and other outdoor improvements.  USPS's Counterclaim, Doc. No. 23, at 4 ¶ 15.  The parties refer to the portion of the premises leased pursuant to the 1969 Main Space Lease as the "Main Space."

The 1969 Main Space Lease also incorporated by reference a purchase option identical to the one in the 1968 Agreement to Lease.  Doc. No. 32-6, at 4 ¶ 15 (referring to ¶ 18).  Paragraph 18, captioned the "Option to Purchase Clause," set forth seven purchase options:

---

[2] The above-referenced maps, "drawing BOS-," are no longer available.  Doc. No. 33-3, at 21.

> In consideration of the award of this lease contract, the Government shall have the option to purchase the fee simple title to the leased premises, including the underlying land, at the following respective times and prices:
>
> (1) At the end of basic lease term                              . . . $350,000.00
>
> (2) At the end of the first-five year renewal term      . . . $345,000.00
>
> (3) At the end of the second five-year renewal term  . . . $340,000.00
>
> (4) At the end of the third five-year renewal term     . . . $335,000.00
>
> (5) At the end of the fourth five-year renewal term   . . . $330,000.00
>
> (6) At the end of the fifth five-year renewal term      . . . $325,000.00
>
>  (7) At the end of sixth five-year renewal option term  . . . $300,000.00
>
> all in accordance with any applicable Federal statutes in effect now or hereafter while the lease is in effect; provided, however, that the Government shall give the Lessor notice of election to purchase at least one year in advance of the respective times set out next above.

("Fixed Price Option").  *Id.* at 7 ¶ 18.

In addition, Paragraph 19 expressly incorporated by reference Gold's bid, the 1968

Agreement to Lease:

> It is expressly understood between the parties hereto that the terms and conditions of the Agreement to Lease executed by Marvin C. Gold and accepted by the Government on September 27, 1968, including any amendments or modifications thereto, are made part of this lease and are to be complied with as though fully set forth herein.

*Id.* at 9 ¶ 19.

USPS leased the Main Space for the initial 20-year term, and then extended its lease to

October 31, 2019 through six five-year renewal terms, at the fixed annual rate.  USPS's Rule 56

Stmt., Doc. No. 34-2 ¶¶ 10, 14.  It is not disputed that USPS timely exercised all renewals and

performed all other obligations, including rental and applicable tax payments.  29 Main LLC's

Stmt. of Undisputed Material Facts Pursuant to Local Rule 56(a)(2) Submitted in Opp'n to

USPS's Mot. for Summary Judgment, Doc. No. 38-2, at 15 ¶ 46 (admitting that "[d]uring its 50-year tenancy, USPS has met all of its obligations under the 1969 Lease").  Nor is it disputed that, throughout its tenancy, USPS paid municipal taxes on the entire property rather than only the "Main Space."  *Id.* 13-14 ¶¶ 40-41.

3.  *The 1988 Short-Form Lease Agreement*

On May 19, 1988, USPS executed a short-form lease agreement with Milford Green Associates for the "Additional Space" excluded from the 1969 Main Space Lease, 1,975 square feet on the first floor and 8,486 square feet of the basement, for an initial term of eighty-three months, extendable for sixty months ("1988 Short-Form Lease").  Doc. No. 32-17.

In Paragraph 14, the 1988 Short-Form Lease contained a rider providing USPS three purchase options for "fee simple title to the land described in the lease, with the buildings and improvements thereon" at a price of "Fair Market Value" at the following times: on October 31, 1989; at the end of the basic lease term, or October 31, 1994; and at the end of the first renewal option term, on October 31, 1999 ("Fair Market Value Option").  *Id.* at 7 ¶ 14.

Paragraph 14-A outlined the parties' agreed-upon fair market value formula, which provided in relevant part:

> The following formula will be used to determine the fair market value and lease fee value of the demised premises of the Postal Service to exercise its purchase options on dates described in Paragraph 14 (Option to Purchase Rider).
>
> 1. The Postal Service shall secure an independent appraisal of the described premises for the purpose of defining purchase price of the lease fee value. The lease fee value will include all options. The residual will be the last fixed option price for the original leased space dated December 2, 1969, recorded in Volume 197, page 380, Litchfield County, Connecticut. The residual for the demised premises will be determined by the appraisal to estimate the lease fee interest of that space.

*Id.* at 8 ¶ 14-A.  The remainder of the formula described the parties' agreed-upon methods for appraising the property and reconciling disputes regarding the appraised value.  *Id.*

USPS extended the 1988 Short-Form Lease through May 30, 2000, until it expired.  Doc. Nos. 32-18, 32-19.  USPS did not exercise any of the purchase options provided by the Fair Market Value Option, and they too expired.

At the conclusion of the 1988 Short-Form Lease, Santomero sought to negotiate a new lease for the entire building, at an annual rate of $165,000.  USPS's Negotiations Summary, Doc. No. 32-25.  USPS, enjoying favorable rental terms, did not oblige.  *Id.* (explaining that, in the negotiations, USPS "t[ook] the position that [the 1969 Main Space Lease Agreement] was a separate contract and that [the agency's 2000 negotiator] was not authorized to renegotiate it").  The stalled negotiations instead resulted in a second, long-form lease for the Additional Space.

### 4.  *The 2000 "Additional Space" Lease Agreement*

On July 7, 2000, USPS and Santomero executed a long-form lease for the 1,975 square feet on the first floor and 9,100 square feet in the basement, for an initial term of ten years with two five-year renewal options ("the 2000 Additional Space Lease").  Doc. No. 32-20, at 1-2. Unlike the 1988 Short-Form Lease, no term of the 2000 Additional Space Lease expressly or implicitly referenced the 1969 Main Space Lease.

In addition, unlike the 1969 Main Space Lease and 1988 Short-Form Lease, the 2000 Additional Space Lease did not provide a purchase option.  The form lease document referenced a Purchase Option Rider, but the reference was crossed out and initialed by each sides' representatives.  *Id.* at 2.  The rider does not appear in the record.  USPS's internal Negotiation Summary regarding the 2000 Additional Space Lease indicates that "Lessor refused to grant a

Purchase Option," while noting that the space leased pursuant to the 1969 Main Space Lease

Agreement "ha[d] a PO." Doc. No. 32-25 at 2.

On July 7, 2000 (the same day as the execution of the 2000 Additional Space Lease), a

USPS contract officer executed a Memorandum of Lease memorializing certain terms of the

2000 Additional Space Lease ("2000 Memorandum"). Doc. No. 32-21. The 2000

Memorandum provides in relevant part:

> The Lease was executed as of July 7, 2000. . . . The Lease term
> commences on May 31, 2000 and ends on May 31, 2010. . . . There are no
> purchase options available. The Lessor hereby leases to the United States
> Postal Service . . . [a] single story brick/block building located at 37 Main
> Street, City of New Milford. . . that is more properly described as
> providing net interior space of 1,975 sq. ft., and basement of 9,100 sq. ft.

*Id*. The 2000 Memorandum is not referenced in the 2000 Additional Space Lease.

USPS renewed the 2000 Additional Space Lease twice, extending it through October 31,

2019.

5. *USPS's Attempt to Exercise the Fixed Price Option and the Expiration of the Leases*

In 2018, more than one year prior to the expiration of the 1969 Main Space Lease and

2000 Additional Space Lease, USPS gave notice of its exercise of the Fixed Price Option. 29

Main LLC's Rule 56 Stmt., Doc. No. 33-2, at 5 ¶ 1. Specifically, by letter dated October 19,

2018, USPS Contracting Officer and authorized agent Joseph Lowe ("Lowe") wrote 29 Main

LLC:

> This letter hereby constitutes notice that the United States Postal Service
> . . . hereby elects to purchase the fee simple title to the leased premises
> located at 37 Main St., New Milford, CT 06776-9998, including the
> underlying land, at the end of the sixth 5-year renewal term for the
> purchase price of $300,000.00, as provided in Option to Purchase Clause
> in Paragraph 18 of the lease.

Notice of Exercise of Option, Doc. No. 32-27.  Lowe's letter was received on October 22, 2018.

USPS Tracking Statement, Doc. No. 34-11.  Later, USPS notified 29 Main LLC of the details

and location of the scheduled closing.  USPS's Rule 56 Stmt., Doc. No. 34-2, at 9 ¶ 51.

On November 30, 2018, 29 Main LLC wrote USPS that the Fixed Price Option was

expired, extinguished, superseded, void, unenforceable, and impossible to perform.  Doc. No. 32-

28.  The 29 Main LLC letter further asserted that USPS had "acknowledged in [the 2000

Memorandum] that no purchase options remained."  *Id.*  On January 2, 2019, USPS responded

that it was ready, willing, and able to close on the Fixed Price Option.  Doc. No. 32-30.  The

parties' papers document subsequent back-and-forth communications.  Docs. No. 32-30 – 32-33.

On October 29, 2019, USPS notified 29 Main LLC that it had wired $325,000 to escrow

officer Chicago Title and Trust for closing.  USPS's Rule 56 Stmt., Doc. No. 34-2, at 9 ¶ 53; *see*

*also* Doc. No. 34-13 (wire transfer transaction receipt, with note "New Milford (MPO) CT

(084794-G01)").  Nonetheless, 29 Main LLC did not participate in the closing.  Doc. No. 34-2*, at*

10 ¶ 56.

On October 31, 2019, the 1969 Main Space Lease and 2000 Additional Space Lease both

expired.  29 Main LLC's Rule 56 Stmt., Doc. No. 33-2, at 7 ¶ 26.  Since November 1, 2019,

USPS has been a holdover tenant of both leases.  Doc. No. 1, at 6 ¶ 24.  USPS has continued to

pay rent, with its funds for the purchase price and closing costs in escrow.  Doc. No. 34-14;

USPS's Rule 56 Stmt., Doc. No. 34-2, at 10 ¶ 59; Lowe Declaration, Doc. No. 34-4, at 9 ¶ 32.

B. Procedural History

On December 23, 2019, 29 Main LLC filed the instant complaint against USPS, seeking

a declaratory judgment that the Fixed Price Option was no longer available, superseded, and/or is

now impossible to satisfy.  Compl., Doc. No. 1.

On March 10, 2020, USPS filed an answer and asserted seven affirmative defenses.  Doc. No. 11.

On June 11, 2020, USPS filed a counterclaim against 29 Main LLC.  Doc. No. 24.  USPS raised one cause of action for specific performance, seeking orders that 29 Main LLC (1) sell, transfer, and convey title; (2) accept consideration of $300,000 minus real estate taxes paid by USPS and credits for USPS's holdover rental payments; and (3) set the date of conveyance *nunc pro tunc* to the October 31, 2019 closing date.  *Id.*

On July 6, 2020, 29 Main LLC answered the counterclaim and asserted nineteen affirmative defenses.  Doc. No. 25.

After several unsuccessful attempts at settlement, the parties proceeded to summary judgment.  USPS's Rule 56 Stmt., Doc. No. 34-2, at 10 ¶ 58.

On July 29, 2021, the parties filed a joint stipulation regarding exhibits to the cross-motions for summary judgment.  Doc. No. 32.

On July 29, 2021, 29 Main LLC moved for summary judgment.  Doc. No. 33.  USPS objected, and 29 Main LLC replied. Docs. No. 37, 39.

On August 2, 2021, USPS moved for summary judgment.  Doc. No. 34.  29 Main LLC objected, and USPS replied.  Docs. No. 38, 40.

After full briefing, I held oral argument on January 28, 2022 and took the cross-motions under advisement.  Doc. No. 42.

**II.     Standard of Review**

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings, but it must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50 (citations omitted).

> The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.
>
> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247–48.  To present a "genuine" issue of material fact, there must be contradictory

evidence "such that a reasonable jury could return a verdict for the non-moving party."  *Id.* at

248.

If the nonmoving party has failed to make a sufficient showing on an essential element of

his case with respect to which he has the burden of proof at trial, then summary judgment is

appropriate.  *Celotex*, 477 U.S. at 322-23.  In such a situation, "there can be 'no genuine issue as

to any material fact,' since a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial."  *Id.*; *accord Goenaga v.

March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied

if he can point to an absence of evidence to support an essential element of nonmoving party's

claim).  In short, if there is no genuine issue of material fact, summary judgment may enter.

*Celotex*, 477 U.S. at 323.

The same standard applies to cross-motions for summary judgment.  In that case, a court

must "assess each motion on its own merits and . . . view the evidence in the light most favorable

to the party opposing the motion, drawing all reasonable inference in favor of that party."  *Bey v.

City of New York*, 999 F.3d 157, 164 (2d Cir. 2021) (quoting *Wachovia Bank, Nat'l Ass'n v.

VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011).

## III.    Discussion

### A.    Choice and Principles of Law

The parties present a limited and largely meaningless dispute regarding whether federal

law applies.  29 Main's Mem. Law, Doc. No. 33-3, at 6 (asserting that it does apply, citing

*United States Postal Serv. v. Jamke*, No. I 15CV01806LJOEPG, 2017 WL 131991, at *6 (E.D.

Cal. Jan. 12, 2017)); USPS's Mem. of Law, Doc. No. 34-1, at 9 (noting that the Second Circuit

has not yet ruled on the issue but noting that federal and state law achieve the same result, citing

*Kerin v. U.S. Postal Serv.*, 116 F.3d 988, 990–91 (2d Cir. 1997)).  I conclude that federal law

applies, and that federal law is consistent with Connecticut law in all material respects.

     Under federal contract law, the Court employs principles of common law contract law

and, as necessary, principles from the Restatement of Contracts and state law.  *Jamke*, 2017 WL

131991 at *6; *United States ex rel. Ubl v. IIF Data Sols.*, 650 F.3d 445, 451 (4th Cir. 2011)

("When applying federal common law to contract issues, courts generally look to the

Restatement for guidance."); *Ginsberg v. Austin*, 968 F.2d 1198, 1200 (Fed. Cir. 1992) (If

"federal law does not answer the issue, [the Court] may look to general property and contract law

principles as they are embodied in state law pronouncements.").  Accordingly, the following

contract principles govern this decision.

     First, I begin with the language of the contract.  Clear terms must be given their plain and

ordinary meaning, *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003),

and their plain and unambiguous meaning controls, *Arko Exec. Servs., Inc. v. United States*, 553

F.3d 1375, 1379 (Fed. Cir. 2009).  If terms are clear and unambiguous, "extrinsic evidence is

inadmissible to interpret them."  *Barron Bancshares, Inc. v. Masterson*, 366 F.3d 1360, 1375

(Fed. Cir. 2004).  A term is unambiguous when "there is only one reasonable interpretation."

*Goldsmith v. United States*, 42 Fed. Cl. 664, 668 (Fed. Cl. 1999).  "The fact that the parties

dispute a contract's meaning does not establish that the contract is ambiguous."  *Jamke*, 2017

WL 131991, at *7 (citation omitted).  On the other hand, if there is ambiguity in the contract

terms, the Court may employ extrinsic evidence to shed light on the parties' intentions.  *Coast*

*Fed. Bank*, 323 F.3d at 1038.  In addition, the Court must "giv[e] reasonable meaning to all parts

of the contract" and "construe the contract to 'effectuate its spirit and purpose.'" *Jamke*, 2017 WL 131991 at *6.[3]

Second, an option is "a continuing offer to sell, irrevocable until the expiration of a set time agreed upon by the parties, which creates in the option holder the power to form a binding contract by accepting the offer." *Bayer v. Showmotion, Inc.*, 292 Conn. 381, 409 (2009); *see also Willard v. Tayloe*, 75 U.S. 557, 564 (1869); Restatement (Second) of Contracts §§ 25, 87 (1981). To validly exercise an option, federal law requires the government to "exercise the option in exact accord with the terms of the contract." *Arko Exec. Servs.*, 553 F.3d at 1379; *see also Bayer*, 292 Conn. at 409 (holding same for a party under state law).

Third, specific performance "lies in the legal discretion of the court." *Texaco, Inc. v. Rogow*, 150 Conn. 401, 411 (Conn. 1963). To compel specific performance of a contract to purchase land under federal law, the party seeking specific performance must establish that (1) a valid contract exists between the parties, (2) that the party seeking specific performance has substantially performed its part of the contract, and (3) that the parties are able to continue performing. *See Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F. 2d 430, 433 (2d Cir. 1993).

---

[3] Where there is ambiguity, contract law employs presumptions to assist with interpretation. I ultimately conclude that the salient contractual text in this case is unambiguous, and I therefore do not exercise contract presumptions. Furthermore, I believe that the competing nature of the presumptions in this case recommend neutral interpretation. It is undisputed that USPS drafted the contracts; therefore, I credit 29 Main LLC's argument that it is entitled to the benefit of any ambiguities under a theory of *contra proferendum*. In addition, 29 Main LLC credibly argues that it is entitled to the benefit of ambiguities because an option must be construed against the party exercising the option. *See* Doc. No. 33-3, at 21 (citing *Pigeon v. Hatheway*, 156 Conn. 175, 183 (1968)). At the same time, USPS argues that it is entitled to the benefit of the doubt as the lessee of the property. Doc. No. 37 at 11 (citing *Texaco, Inc. v. Rogow,* 150 Conn. 401, 409 (1963)). Rather than try to navigate a maze of presumptions, I would embrace 29 Main LLC's argument in the alternative that the Court should construe the terms neutrally without favoring either party. Doc. No. 39, at 8.

B. The Parties' Arguments

In brief, 29 Main LLC asserts that the unambiguous terms of the 1969 Main Space Lease, 2000 Additional Space Lease, and related documentation render impossible the specific performance that USPS seeks, and that the Fixed Price Option is extinguished.  Doc. No. 33-2, at 22.  USPS asserts that the unambiguous terms of the 1969 Main Space Lease establish an irrevocable option, that it has performed all of its obligations, and that it is ready to perform; therefore, this Court should order specific performance.  Doc. No. 34-1, at 8-9.  I begin by presenting the parties' arguments.

1.  *29 Main LLC's Motion for Summary Judgment*

In support of its motion for summary judgment, 29 Main LLC argues as follows.

First, the Fixed Price Option was "rescinded and extinguished," because it is inconsistent with the 2000 Additional Space Lease and 2000 Memorandum, which memorialized that "[t]here are no purchase options available."  29 Main LLC's Mem. of Law, Doc. No. 33-3, at 9.

Second, the Fixed Price Option is invalid and impossible to perform, because 29 Main LLC cannot convey only "the leased premises," or the portion of the property subject to the 1969 Main Space Lease (the Main Space), while retaining the space exempted by the lease (the Additional Space).  *Id.* at 11-12.  Further, the parties' alleged "agree[ment] to exempt the portion of the building leased to [USPS]" under the 2000 Additional Space Lease is a supervening event entitling 29 Main LLC to relief from enforcement of the Fixed Price Option.  *Id.* at 12.

Third, the Fixed Price Option should be rescinded due to mistake for three reasons.  *Id.* at 14.  The parties made a mutual mistake regarding the boundaries of the property to be sold and the feasibility of the conveyance.  *Id.*  Or, in the alternative, 29 Main LLC was unilaterally mistaken regarding the enforceability of the Fixed Price Option after the 2000 Additional Space

16

Lease and 2000 Memorandum.  *Id.* at 16.  Furthermore, reformation is inappropriate because 29 Main LLC understood that the absence of a purchase option associated with the 2000 Additional Space Lease meant that both parties were agreeing to extinguish the Fixed Price Option, and it would be unconscionable to compel it to sell the Additional Space in accordance with the terms of the Fixed Price Option.  *Id.* at 17.

Fourth, the Fixed Price Option is void for being insufficiently definite to pass muster under the Connecticut Statute of Frauds, because the parties are unable to distinguish the portion of the premises exempted by the 1969 Main Space Lease from the remainder of the premises.  *Id.* at 18-21.

### 2.  *USPS's Motion for Summary Judgment*

USPS argues that it is entitled to specific performance for the following three reasons.

First, USPS has a valid contract.  The unambiguous terms of the entire 1969 Main Space Lease confer an irrevocable option to purchase the entire property, which no subsequent amendment altered, and identically worded option clauses have been held irrevocable and enforced in other courts.  USPS's Mem. of Law, Doc. No. 34-1, at 10-14.  USPS properly exercised the Fixed Price Option by providing notice of exercise in a timely fashion, which caused the Fixed Price Option to mature into a binding contract.  *Id.* at 14.

Second, USPS performed all of its obligations under the contract.  *Id.* at 15.

Third, the parties can perform. USPS is prepared to purchase; it has wired funds for the purchase price plus closing costs to an escrow agent, and the funds remain in escrow.  *Id.*  In addition, 29 Main LLC is able to perform because it holds title and is obligated as a matter of law by the Fixed Price Option to convey title.  *Id.* at 15-16.  Further, concluding that the Fixed Price Option is void would deprive the USPS of its benefit of the 1969 bargain.  *Id.* at 18.

C.  Analysis

After carefully considering the parties' arguments, scrutinizing the various documents at issue in this matter, considering the text of the Fixed Price Option in light of precedent, and evaluating the objective intent of the parties to the 1969 Main Space Lease as evinced by its text, I conclude that no material facts are genuinely disputed and that this matter may properly be resolved at summary judgment.  I hold that: (1) a valid option contract exists between the parties, (2) USPS has substantially performed its responsibilities pursuant to the option contract, and (3) the parties are able to continue performing.  As a result, USPS is entitled to summary judgment on its claims and the specific performance it seeks.  None of 29 Main LLC's attempts to undermine USPS's entitlement to the entire subject property counter that result.

1.  *The 1969 Fixed Price Option Is A Valid Option Contract*

USPS has established the first prong for specific performance: a valid contract.

"To form an agreement binding upon the government, four basic requirements must be met: (1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States in contract."  *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003).  In Connecticut, the "essential" terms necessary to objectively manifest mutual intent in a contract governing the sale of real property include: "the parties, a description of the subject of the sale, and the terms of payment, including a basis for determining the total purchase price. . . ."  *Bayer*, 292 Conn. at 412-13.

Here, the Fixed Price Option provides that, "[i]n consideration of the award of this lease contract, the Government shall have the option to purchase the fee simple title to the leased premises, including the underlying land" provided that "the Government shall give the Lessor

18

notice of election to purchase at least one year in advance" of the times set forth in the agreement. Thus, the Fixed Price Option sets forth the terms for a valid real property contract: the parties ("the Government" and "Lessor"); a description of the subject of the sale, "fee simple title to the leased premises, including the underlying land"; and the payment terms of a price of $300,000 at the end of the sixth five-year renewal term, in consideration of the lease award. Doc. No. 32-6, at 7 ¶ 18. The parties dispute the description of the subject of the sale, disagreeing about whether it sufficiently manifests the parties' mutual intent and is unambiguous. I begin with this most contested issue. I then address how the payment terms clarify the originally contracting parties' intent, supporting my conclusion that the terms were sufficiently definite to constitute an unambiguous offer manifesting 29 Main LLC's predecessor in interest's intent to sell the entire subject property.

   a.   The Fixed Price Option Offers to Sell the Entire Property

The Post Office Department and Gold included the Fixed Price Option in the 1969 Main Space Lease as a continuing offer to sell *something*, but what? The purchase option defines the subject of the sale as "fee simple title to the leased premises, including the underlying land." Doc. No. 32-6, at 7 ¶ 18. The problem is that the phrase "the leased premises" risks ambiguity by lending itself to two interpretations. "Premises" refers to "[a] house or building, along with its grounds," which suggests that the phrase "the leased premises" could refer to either the leased portion of the property *or* the entire building and its grounds. Premises, *Black's Law Dictionary* (11th ed. 2019). Thus, as 29 Main LLC asserts, the Fixed Price Option "does not clarify" whether USPS is entitled to the excepted portions of the building pursuant to the 1969 Main Space Lease, the Additional Space. 29 Main LLC's Mem. of Law, Doc. No. 33-3, at 11.

Principally relying on the phrase "the leased premises," 29 Main LLC argues that the Fixed Price Option unambiguously offers for sale only the Main Space and is therefore impossible to perform under several theories.  USPS, principally relying on the phrase "fee simple title . . . , including the underlying land," argues that the Fixed Price Option unambiguously offers to sell the entire property.  I conclude that 29 Main LLC's contention is predicated on an incomplete reading of the 1969 Main Space Lease and Fixed Price Option, and it is wrong as a matter of law.  The contract drafting is not exemplary, but it is not ambiguous; the unambiguous subject of the sale is title to the underlying land and, as a matter of law, the entire building thereon.

> i.   Although the Main Space Constitutes Only a Portion of the Property, "The Leased Premises" Is Not Necessarily Limited to the Main Space

Logically, 29 Main LLC's case rests on a two-step chain of reasoning.  First, 29 Main LLC correctly concludes that the portion of the property leased by USPS in 1969 constituted less than the entire subject property.  Second, 29 Main LLC assumes that the phrase "the leased premises" refers only to that portion of the property.  *See* 29 Main's Mem. of Law, Doc. No. 33-3, at 12 ("[A]s the Option is written, it limits the conveyance to only the *leased* premises and the underlying land."); 29 Main's Opp'n, Doc. No. 38, at 9.  I disagree with 29 Main LLC that the phrase "the leased premises" dispositively circumscribes the purchase option, an assumption that I believe does not withstand scrutiny.

First, I begin by acknowledging an undisputed fact essential to 29 Main LLC's construction of the Fixed Price Option, that the premises leased pursuant to the 1969 Main Space Lease, the Main Space, constituted only a portion of the subject property.

It cannot genuinely be disputed that the Main Space was less than the entire subject property.  *See* 1969 Main Space Lease, Doc. No. 32-6, at 1 ¶ 2.  Paragraph 2 provided a metes

and bounds description of the former First National parcel: "[a]ll that certain land, containing

approximately 48,365 square feet having a frontage on Main St. of 168.22'; a southerly bound of

307' more or less; a northerly bound of 306' more or less; a rear bound in two segments of 88'

more or less and 74.5' more or less. . . ."  *Id*.  It is undisputed that the metes and bounds

description pertained to the entire parcel of underlying real property.  *See* Doc. No. 38-2, at 4-5 ¶

11.  Paragraph 2 then characterized the demise in more detail, describing (1) "a one-story and

basement brick building providing [(a)] approximately 9390 sq. ft. of net interior first floor area"

and (b) a "basement providing approximately 1148 sq. ft. of space," which described less space

than the entire first floor or basement; (2) a "platform and ramp of approximately 1470 sq. ft.";

(3) and outdoor space consisting of "exclusive use of paved driveway[,] parking[,] and

maneuvering area of approximately 31,271 sq. ft., and sidewalks and landscaped areas of

approximately 3690 sq. ft."  Doc. No. 32-6, at 1 ¶ 2.  Paragraph 2 further expressly "except[ed]"

certain areas as "not Req'd for [Post Office Department] use," excluding a "first floor building

area of about 1975 sq. ft. . . . [and a] basement area of 10,248 sq. ft. . . ."  *Id*.  Taken together, the

Main Space was unambiguously less than the entire subject property.

Of course, it *is* undisputed that the Main Space constituted less than the entire subject

property.  USPS concedes that the "areas described as 'Space not Req'd for [Post Office

Department] use' . . . were excepted from the areas occupied by the USPS under the 1969 Main

Space Lease."  USPS's Opp'n, Doc. No. 37, at 9-10.[4]  Instead, USPS disagrees with the second

---

[4]      To the extent to which USPS attempts to incorporate more of the subject property into the Main Space, its
effort is unavailing.  *See* Doc. No. 37-1, at 2 ¶ 2 ("The USPS denies that it leased a '*portion*' of the property. . . .")
(emphasis original); *id*. at 5-6 ¶ 6; *see also* Doc. No. 37, at 9-10 (arguing that the fact that "Areas that will not be
used for final occupancy" were nevertheless "subject to work incidental to supplying any services for the remodeled
bld'g" was evidence that the unfinished basement was intended to "support and provide 'incidental services'" to the
USPS and was therefore part of the "leased premises") (quoting Doc. No. 32-6, at 1 ¶ 2).
        I perceive two problems with USPS's argument in opposition.
        First, the Main Space unambiguously excluded certain areas, including the "subject to" portions of the
basement that USPS later rented pursuant to the 1988 Short-Form Lease and the 2000 Additional Space Lease

step of the plaintiff's syllogism, that the phrase "the leased premises" in the Fixed Price Option necessarily describes only the Main Space.

Neither party provides any authority construing partial leases with similarly-worded option clauses. 29 Main's Opp'n, Doc. No. 38, at 5 (arguing that there is no precedent supporting USPS's conclusion that the Fixed Price Option is valid and enforceable); USPS's Mem. of Law, Doc. No. 34-1, at 16 n.3 (analogizing to rights of way in deeds); USPS's Opp'n, Doc. No. 37, at 9-10 (same). Although neither party relies on it, I believe that *Texas Company v. Crown Petroleum Corporation*, 137 Conn. 217 (1950), is an instructive analogue. I discuss the case at length and draw out its lessons.

There, lessee Texas Company ("Texas Co.") leased a portion of a larger parcel of real property for use as gas station. *Id.* at 217. The other portion contained a two-family home. *Id.* Texas Co.'s lease contained a similar purchase option ("the specific price purchase option"), featuring an option to purchase "the demised premises":

> (9)—Option.— Lessor hereby gives to lessee the right and option to purchase the demised premises and all structures and improvements thereon at any time during the term of this lease or any extension or renewal thereof, for the sum of Twenty-Seven Thousand Five Hundred Dollars ($27,500.00).

*Id.* at 220 (quotation marks omitted). The next sentence supplemented the foregoing with a metes and bounds description of the entire parcel. *Id.*

Subsequently, the lessor's successor in interest, Crown Petroleum Corporation ("Crown"), took title to the parcel subject to Texas Co.'s lease and purchase option. Thereafter,

---

Agreements, and I am bound by the plain meaning of the lease. Because the language is unambiguous, I do not reach beyond the text to the parties' intent.

    Second, in my view, USPS's reading of the "subject to" provision compels an absurd result. Imagine an analogous scenario in which the fee simple owner of a condominium lacking in-unit laundry possesses a license for a common basement laundry room pursuant to her condominium deed. Although the laundry room is "subject to" and provides "services" to the condominium owner, she does not own the laundry room and may not exclude her neighbors from it. Applying USPS's reading of the "subject to" term, the condominium owner could exercise the bundle of sticks conferred by ownership over the common space, including the right to exclude.

Texas Co. and Crown executed a supplementary agreement containing another purchase option. *Id.* at 222. The "supplementary purchase option" offered for sale a larger share of the property than the demised portion but a smaller share than the entire parcel, for a price lower than the specific price option ("the supplementary purchase option"). *Id.* at 222. When Texas Co. exercised the supplementary purchase option and tendered the purchase price, Crown refused to convey title. *Id.* As a result, Texas Co. brought suit for specific performance. The trial court ordered Crown to convey the property in accordance with the supplementary agreement. *Id.*

On appeal, Crown argued that the supplementary agreement was unenforceable for three reasons: the agreement lacked consideration, the parties were mutually mistaken, and Texas Co.'s exercise of the option was not timely. *Id.* at 223. The Connecticut Supreme Court addressed each issue, then affirmed the trial court's judgment. I address the consideration and mistake analyses, which are instructive for the case at bar.

First, the Court was not persuaded by Crown's construction of the specific price option and, consequently, its consideration claim. Like 29 Main LLC does here, Crown construed the subject of the purchase option as limited to "the demised premises," or the share of the property that Texas Co. had leased for its gasoline station. *Id.* at 223. On that basis, Crown argued that Texas Co. had gotten a too-good deal. Relying on "the demised premises" as the subject of the specific price option, Crown posited that the supplementary purchase option offered to sell Texas Co. a larger portion of the property at a lower price than the specific price option. *Id.* Under that theory, Texas Co. had not made any concessions constituting consideration in connection with the supplementary agreement. *Id.*

The Court disagreed, seemingly concluding (although without expressly deciding) that the specific price option pertained to the entire property. *Id.* The Court reasoned that the parties'

23

intentional choice to "immediately" follow the sentence containing "the leased premises" with the supplemental metes and bounds description of the property "evidenced the[ir] intention . . . that the property so described should be subject to the option." *Id.* at 223-24. Primarily on that basis, the Court concluded that Texas Co. had provided valuable consideration by "surrender[ing]" its right to argue in court that the specific price option provided a right to purchase the entire parcel. *Id.* at 224.

The Court did not conclusively interpret the specific price option in accordance with Texas Co.'s construction. *Id.* Although appearing to favor Texas Co.'s interpretation, the Court identified ambiguity "[o]n the face of the lease" regarding "just what property was intended to be included in the option" and declined to resolve it. *Id.* Notwithstanding the lack of a resolution, the Connecticut Supreme Court nevertheless illustrated the importance of evaluating a purchase option in full, and within the context of the remainder of the agreement in which it is situated.

Here, 29 Main LLC commits a similar error as Crown by treating the phrase "the leased premises" as dispositive. Like in *Texas Co.*, the remainder of the Fixed Price Option, the broader 1969 Main Space Lease, and the 1968 Agreement to Lease (expressly incorporated by reference therein) calls 29 Main LLC's conclusion into question. As will I soon address, the Fixed Price Option offered to sell "fee simple title" to "underlying land," the 1969 Main Space Lease described the underlying parcel in metes and bounds, and other features of the parties' agreements evince intent to effectuate a sale-leaseback arrangement. Therefore, as the *Texas Co.* court explained: although "[i]t is true that at one point the lease describes the property covered by the option as the 'leased premises,'" USPS is still "in a position to make at least a substantial and bona fide claim . . . that the option should be interpreted to cover the entire premises." *Id.* at 223-24. I acknowledge that the purchase option in *Texas Co.* contained more definite language

than the Fixed Price Option, including "all structures and improvements thereon" and the metes and bounds description. Regardless, *Texas Co*. undermines 29 Main LLC's bedrock assumption that "the leased premises" refers exclusively to the Main Space and challenges its assertion that no precedent supports USPS's construction of the Fixed Price Option.

Second, the *Texas Co.* Court rejected Crown's claim that the supplementary agreement was unenforceable because the parties had agreed to it under the allegedly erroneous belief that the specific price option conferred on Texas Co. an option to purchase the entire property. *Id.* at 225. In other words, Crown's argument was premised on the idea that Crown's assumption that the specific price option was not directed towards the entire property warranted recission of the parties' later agreement. The Court disagreed, holding that both the lessee and lessor had agreed that the specific price option covered the entire property and, further, that "neither party was mistaken" regarding that belief. *Id.* at 225-26. Therefore, there was no basis for a mutual mistake and no ground for recission. *Id*.

Here, 29 Main LLC presents similar arguments. 29 Main LLC asserts that the parties to the 1969 Main Space Lease were mistaken about what the Fixed Price Option purported to offer for sale or, in the alternative, that 29 Main LLC was unilaterally mistaken regarding the parties' alleged 2000 agreement to extinguish the Fixed Price Option. On those bases, it seeks recission of the Fixed Price Option. The *Texas Co.* Court again provides insight regarding how to analyze those claims and casts doubt upon 29 Main LLC's desired remedy.

There, the Court assumed *arguendo* that the specific price option was ambiguous and addressed whether rescinding the supplementary agreement was the proper remedy. *Id.* at 226. It resoundingly rejected Crown's request for recission, providing:

> If it is granted that both parties to the supplementary agreement failed to appreciate the fact that there was an ambiguity in the original option, that

25

would not constitute such a mutual mistake as would justify a rescission of the supplementary agreement.  The right to relief against the consequence of a mutual mistake is an equitable right.  In cases involving a claimed mistake of law, it is only when one person has obtained an unconscionable advantage over another that equity will grant relief. . . .

In the present case, the plaintiff did not obtain an unconscionable advantage by reason of any mistake of the parties concerning the definiteness of the original option.  What it received under the supplementary agreement was no more than it was justly entitled to by reason of the actual agreement between it and the lessors.  The court would not do equity if it permitted the defendant to avoid its liability upon the supplementary agreement on the ground that it did not know that the [specific price] option was ambiguous in its description of the land which the parties to that option really intended to describe.

*Id.* at 225-26 (citations omitted and line break added).  Accordingly, *Texas Co.* instructs that an

alleged mistake must be evaluated against the contracting parties' intent at the time the contract

at issue was made, and it counsels that recission is only appropriate in extraordinary cases

implicating both a mistake and an "unconscionable advantage."  It thereby suggests that reliance

on the phrase "the leased premises" is not, without more, sufficiently conclusive to warrant the

extraordinary remedy 29 Main LLC seeks through this lawsuit.

In sum, I reject 29 Main LLC's assumption that "the option to purchase . . . the leased

premises" conclusively establishes that the Fixed Price Option was meant to convey only the

Main Space as an unduly narrow construction.  Instead, I look to the entire text of the option

specifically and 1969 Main Space Lease broadly to determine the subject of the Fixed Price

Option.

    ii.  <u>The Offer to Sell the "Underlying Land" in "Fee Simple" Offered to Sell the Buildings Thereon</u>

I agree with USPS that the Fixed Price Option, offering for purchase "fee simple title" to

"the underlying land," constitutes an offer to sell the entire property.  USPS's Mem. of Law,

Doc. No. 34-1, at 16-17.  USPS argues that a fee estate is a "whole or unlimited estate" as a

26

matter of law; thus, a conveyance of land includes the buildings thereon. *Id.* at 17 (quoting *Rosenblum v. Eisenhauer*, 29 Conn. Supp. 216, 222 (1971)). Accordingly, upon USPS's proper exercise of the Fixed Price Option, the terms of the option dictate that 29 Main LLC is bound to convey the whole subject property, unless there is a sufficient showing of the parties' intent to sever the conveyance of the land from the portions of the edifice known as the Additional Space.

Both parties cite to the same precedent to bolster their arguments, characterizing the cases differently. USPS asserts that the cited-to cases support ordering 29 Main LLC to convey the entire property, because a promise to convey the underlying land in fee simple necessarily promises to convey the entirety of any buildings. *Id.* By 29 Main LLC's reading, those cases stand for the proposition that the buildings are inseparable from the land and, therefore, that it cannot be forced to partition the building to comply with the Fixed Price Option. Doc. No. 38, at 8. I agree with USPS's interpretation of the precedent and its conclusion the Fixed Price Option offered to sell the entire property, including both the Main and Additional Space.

The parties first address *Kutter v. Smith*, 69 U.S. 491 (1864). In that case, a lessee built a structure on a leased property. *Id.* at 492. Upon ejectment for nonpayment of rent, the lessee sought to recover the appraised value of the structure from the lessor. *Id.* at 493. The United States Supreme Court concluded that the lessee lacked legal title to the structure, because "such erections . . . become a part of the land." *Id.* at 499-500. Accordingly, the lessee had no claim to the structure and its value. *Id. Kutter* broadly posits that the owner of the land owns the structures on that land.

The parties next address *Isham v. Morgan,* 9 Conn. 374 (1832), an old Connecticut Supreme Court decision and better factual fit. There, landowner Dudley Wright conveyed his land and one-half of the buildings on the land to his daughter as a gift. *Id.* at 375. Later that day,

Wright conveyed the other half of the buildings to his daughter's husband for $300. *Id.* The Court held that Wright's gift to his daughter had conveyed the whole estate, reasoning that a conveyance of land also conveys the building on the land. *Id.* at 377-78 ("*Cujus est solum, ejus est usque ad cœlum*."). Because Wright had already conveyed the whole estate to his daughter, he could not then convey a portion he no longer owned to her husband. *Id.* at 378. Thus, Wright's attempted conveyance to the husband was a legal nullity.

Well-established property principles undergirding *Kutter* and *Isham* direct that USPS's interpretation of the Fixed Price Option is the proper construction as a matter of law.

The first principle is that "a fee simple interest" is a "whole or unlimited interest embracing all the elements of complete ownership." *Redevelopment Agency of City of Norwalk v. Norwalk Aluminum Foundry Corp*., 155 Conn. 397, 401 (1967); Conn. Gen. Stat. § 47-1 ("Each proprietor in fee simple of lands has an absolute and direct dominion and property in the same. . . ."); *see also Rosenblum*, 29 Conn. Supp. at 222 ("The words 'in fee simple' . . . means 'a whole or unlimited estate.'"). In other words, as here, an offer to convey land in "fee simple" is an offer to convey absolute ownership of that land.

The second principle is the *ad coelum* doctrine, famously reiterated by Blackstone, which holds that the "one who owns the soil owns to the heavens above." 42 A.L.R. 945 (citing 2 Bl. Com. 18). Although the *ad coelum* doctrine used to be absolute, modern property law has circumscribed it with respect to air and subsurface rights. *See, e.g., United States v. Causby*, 328 U.S. 256, 261 (1946) (establishing that the airspace overhead is a public highway and part of the public domain). Nevertheless, even modern property law recognizes the principle that "[t]he landowner owns at least as much of the space above the ground as the [owner] can occupy or use in connection with the land," including for the purpose of erecting and occupying buildings. *Id.*

at 264.  As a result, the law recognizes a strong presumption that the fee simple owner of a property also owns the buildings that sit on the land, absent explicit severance of title to the land from title to the buildings or some clearly-defined portion thereof.

The third principle is the related (and ancient) doctrine of *accessio*, by which a property owner has a right to "all that is added to the property."  *Accession, Black's Law Dictionary* (11th ed. 2019) (quoting John George Phillimore, *Private Law Among the Romans* 143 (1863)).  The doctrine of accession gives rise to "treating buildings . . . as permanent fixtures annexed to the soil."  *Landon v. Platt*, 34 Conn. 517, 524 (1868).  From there, it follows that "the building belongs to the owners of the soil," *id.*, because it has "become a part of the land," *Kutter*, 69 U.S. at 499-500.

Here, the Fixed Price Option unambiguously provides USPS an option to purchase title to the "underlying land" in "fee simple."  As *Isham* asserts, "[i]t is an established rule of law . . . that a conveyance of land, by necessary legal consequence, conveys the buildings thereon."  9 Conn. at 374.  Therefore, as restated for contemporary times, Gold's undisputed offer to sell all of the underlying land to the Post Office Department establishes a strong presumption that he offered to sell the entire building on the land, which may be rebutted by a sufficient showing that the parties intended a different arrangement.

However, on these facts, there is an insufficient showing that the parties intended to sever the Additional Space from the Main Space.  In *Pigeon v. Hatheway*, a case on which 29 Main LLC relies for its Statute of Frauds argument, the purchase option at issue unambiguously reflected the parties' intent to sever a portion of the premises.  *See* 29 Main's Mem. of Law, Doc. No. 33-3, at 20; 156 Conn. 175 (1968).  There, the purchase option expressly stated, "THERE IS EXCEPTED from this option to purchase, and specifically excluded therefrom, the houselot of

about one (1) acre, together with the house and garage situated thereon." *Id.* at 180 n.1 (capitalization original).  There, the purchase option clearly manifested intent to exclude a portion of the underlying land from remainder offered for sale, notwithstanding the fact that the purchase option failed to properly articulate the excluded portion of the property.  *Id.* at 184. Here, the Fixed Price Option does not explicitly exclude any portion of the property, except to the extent to which its text implicates the disputed meaning of the term "the leased premises." For the same reasons that I cannot assume that "the leased premises" refers only to the Main Space, I cannot conclude that the presumption against severance has been rebutted.

Finally, I favor applying the *Kutter* and *Isham* principles because the challenge that 29 Main LLC identifies— that it is "impossible" to convey "only the leased premises," or the Main Space, "while retaining the Additional Space"— necessarily arises from its interpretative approach.  29 Main LLC's Mem. of Law, Doc. No. 33-3, at 12, 15, 17.  Although I disagree with 29 Main LLC that "[t]here is no way to value or convey a portion of a parcel of real property and a portion of the building located on it," I acknowledge that such a conveyance is disfavored as a matter of public policy.  *Id.* at 16.  Consider the condominium, a hybrid interest in real property by which a unit owner obtains a fee simple interest in a unit and a lesser interest in common areas.  *E.g.*, Conn. Gen. Stat. § 47-68a(c).  Due to the risks inherent in such arrangements, condominiums are heavily regulated creatures of statute.  *See Celentano v. Oaks Condominium Assn.*, 265 Conn. 579, 592, 598 (2003).  Indeed, the state's comprehensive regulatory scheme for condominiums and other common interest communities was developed in part to address concerns 29 Main LLC implicates regarding unconscionable outcomes for partial owners.  *Id.* at 597-98 (quoting Senator Martin Looney for the proposition that "unconscionable ground leases . . . ha[ve] become a problem . . . [because] a long-term ground lease with an escalating clause has

created a very difficult and punitive situation for the people who own the units but not the ground under them and has rendered those units unmarketable") (quotation shortened).

In *Celentano v. Oaks Condominium Association*, the Connecticut Supreme Court assessed the lawfulness of a hybrid condominium, by which a unit owner expressly obtained title in fee simple to a unit but only a leasehold interest in a fraction of the underlying land and common areas, and squarely confronted the public policy implicated by 29 Main LLC's construction of the Fixed Price Option. 265 Conn. at 592. There, the Court held that the hybrid interest arrangement was legal, but only after rigorously evaluating whether the arrangement was not prohibited by the regulatory scheme. *Id.* at 598-99. In addition, the Court emphasized that the General Assembly had enacted a remedy for common problems with hybrid interest arrangements, including a presumption of unconscionability and preclusion of certain affirmative defenses. *Id.* at 598-99 (citing Conn. Gen. Stat. § 47-210). In my view, 29 Main LLC's interpretative approach would lead to severing the Additional Space from the Main Space and underlying land, and inviting challenges analogous to the condominium context so heavily scrutinized by the Court in *Celentano*. But, here, 29 Main LLC raises those concerns outside the context of the regulations and legal protections governing condominiums.

Moreover, as the *Celentano* Court explained, 29 Main LLC's construction of the Fixed Price Option risks an absurd result. There, the defendants argued in the alternative that the hybrid condominium arrangement was unlawful because the unit owners did not have individually exercisable purchase options for their interest in the underlying land, even though the Condominium Act required the provision of a purchase option. 265 Conn. at 599 (referring to Conn. Gen. Stat. § 47–68a(cc) (requiring "that the lessee shall have the option to purchase the fee simple title to the demised property during the term of the lease at a price stated or by a

method stated for subsequent determination of the total price"). The Court dismissed the argument, reasoning that it would "be absurd even to contemplate individually exercisable purchase options in the underlying ground for each of the 108 unit owners." *Id.* at 601.

Here, 29 Main LLC's construction of the Fixed Price Option would engender a similarly absurd result: individually exercisable purchase options for each of the Main Space and, at least for the duration of the 1988 Short-Form Lease, the Additional Space. But precedent holds that this Court should not construe the 1969 Main Space Lease and the Fixed Price Option in way that leads to an absurd result. *See Celentano,* 265 Conn. at 601; *Welch v. Stonybrook Gardens Co-op., Inc*., 158 Conn. App. 185, 198 (2015) (citing to *Waesche v. Redevelopment Agency of City of New London*, 155 Conn. 44, 51 (1967)).

In sum, I acknowledge that there is some inconsistency on the face of the Fixed Price Option between the partially leased edifice ("the leased premises") and the offer to sell the entire property ("title in fee simple . . , to the underlying land"). Nevertheless, I conclude that the contract terms are unambiguous as a matter of law. The 1969 Main Space Lease provides both that the Main Space constituted less than the entire building *and also* that, after proper exercise of the Fixed Price Option, 29 Main LLC must convey fee simple title to the underlying land. The offer to sell title to the underlying land in fee simple— the offer held open by the Fixed Price Option— offers to convey the entire property, including the entire building. The phrase "the leased premises," if perhaps inartful, is insufficient textual support for the proposition that the parties contracted to sever the unleased premises from the rest of the subject property.

As a result, I embrace USPS's construction that the Fixed Price Option offers to sell the entire subject property, and I conclude that 29 Main LLC's circumscribed reading of the Fixed Price Option as limited to Main Space as the "the leased premises" must fail.

        b.   The Fixed Price Option Contains Definite Payment Terms and Valid
             Consideration

Moreover, to any extent that the meaning of the Fixed Price Option is unresolved by

applying longstanding property principles, the payment terms sufficiently reflect the originally

contracting parties' mutual intent to contract for a sale-leaseback arrangement to settle any

remaining uncertainty.  In addition, the payment terms also fulfill the consideration requirement

necessary to establish a valid contract.

In this case, the Fixed Price Option provides clear payment terms describing valid

consideration: "[i]n consideration of the award of this lease contract," after six five-year renewal

terms, the price of the "leased premises . . . and underlying land" will be $300,000.  1969 Main

Space Lease, Doc. No. 32-6, at 7 ¶ 18.  The payment terms describing the bargained-for

consideration illustrate a sale-leaseback arrangement, lending additional support for USPS's

construction of the Fixed Price Option as directed towards the entire property and strengthening

its claim that the Fixed Price Option manifests mutual assent to offer the entire subject property

for sale.

USPS characterizes its transaction with Gold as a straightforward sale-leaseback

arrangement.  USPS's Opp'n, Doc. No. 37, at 7.  For support, it cites to *Heyman v. CBS, Inc.*,

178 Conn. 215 (1979), a case in which the Connecticut Supreme Court described an analogous

transaction in similar terms.  There, defendant Heyman's predecessor in interest, Reeves

Soundcraft Corporation ("Soundcraft"), purchased unimproved real property with plans to build

a manufacturing facility on the land.  *Id.*  Soundcraft similarly "decided not to construct the plant

itself but rather to have it constructed by Lazarus Heyman," the plaintiffs' predecessor in

interest, under a sale-leaseback arrangement in which Soundcraft would receive option to

repurchase the property improved with the factory.  *Id.* at 217.  Soundcraft executed a lease with

Heyman's company, which assigned its interest to Heyman. *Id.* Later, when Soundcraft's successor in interest exercised the purchase option, Heyman's successor in interest refused to convey title. *Id.* The Connecticut Supreme Court denied the plaintiffs' challenge and held that the purchase option was enforceable. *Id.* at 223.

I agree with the characterization of the arrangement between Gold and the Post Office Department as a sale-leaseback arrangement. Here, the "lease award" serving as consideration clearly refers to the Post Office Department's decision accept Gold's bid and assign him its original September 11, 1968 option to purchase the First National Property on September 27, 1968. *See* Option to Purchase Land, Doc. No. 32-5. Like Soundcraft, the Post Office Department decided not to renovate the First National Property itself but to have it renovated by a developer. Thus, in consideration for the Post Office Department's acceptance of Gold's bid (rather than other bidders' bids) to renovate the property and USPS's assignment to Gold of its right to purchase the property for $150,000, the Post Office Department expressly contracted for, *inter alia,* the option to "repurchase" the property. *See* Agreement to Lease, Doc. No. 32-4, at 7 ¶ 11.

The sale-leaseback arrangement was embodied by the 1968 Agreement to Lease, which the 1969 Main Space Lease expressly incorporated by reference. 1969 Main Space Lease, Doc. No. 32-6, at 8 ¶ 19. Therein, the rental rates and the "*repurchase* options" later adopted by the 1969 Main Space Lease were only valid if Gold were able to purchase the First National property for $150,000 or less. 1968 Agreement to Lease, Doc. No. 32-4, at 7 ¶ 11 (emphasis added). USPS assigned its right to purchase the First National property to Gold. Doc. No. 37, at 7; Option to Purchase Land, Doc. No. 32-5. It is undisputed that Gold purchased the property for $150,000, an amount within his acceptable price range. Doc. No. 32-2, at 2; Doc. No. 38-2, at 2

34

¶ 3.  Accordingly, as USPS argues, Gold's price condition was satisfied, and the lease prices and repurchase options set forth in the 1968 Agreement to Lease became binding on the parties to the 1969 Main Space Lease and their respective successors in interest.

Accordingly, the payment terms to the Fixed Price Option establish valid consideration and lend additional support for USPS's claim to the entire property.

### c.   The Fixed Price Option Is Not Invalid

Next, 29 Main LLC presents several arguments asserting the Fixed Price Option is defective.  The arguments lack merit.

### i.   The Fixed Price Option Was Not Extinguished by the 1998 Short-Form Lease

The Fixed Price Option was not extinguished by the 1988 Short-Form Lease and its Fair Market Value Option.[5]

Like the 1969 Main Space Lease, the 1988 Short-Form Lease contained a purchase option.  Paragraph 14 of the 1988 Short-Form Lease provided USPS an option to purchase "fee simple title to the land described in the lease, with the buildings and improvements thereon" for fair market value, at the end of the basic lease term and after the first renewal period.  Doc. No. 32-17, at 7 ¶ 14.

Like the Fixed Price Option, the Fair Market Value Option offered to sell the entire property.  The Fair Market Value Option contained a similarly inartful description of the property for sale; the "land described in the [1988 Short-Form L]ease" was the Additional Space, or the portions of the first floor and basement that USPS did not rent in 1969.  But, again, the inartful description of the subject property is not the whole story.  Rather, the Fair Market Value

---

[5] The parties do not address this issue, but I believe that my construction of the Fixed Price Option requires me to address the potential implications of the Fair Market Value Option.  Therefore, I address the issue *sua sponte*.

Option offered to sell fee simple title to the land and buildings thereon.  Therefore, I conclude it offered to sell the entire subject property.  In contrast to the Fixed Price Option, however, the Fair Market Value Option offered to sell the subject property at different times and for a different amount: for "Fair Market Value" as defined by the formula in Paragraph 14-A.

Because both purchase options offered to sell the entire property for different prices, I must probe whether the parties intended for the Fair Market Value Option to substitute the Fixed Price Option.  A substituted contract is one that is "accepted by the obligee in satisfaction of the obligor's existing duty," thus "discharg[ing]" the original duty.  Restatement (Second) of Contracts § 279 (Am. L. Inst. 1981); *see also Bannum, Inc. v. United States*, 80 Fed. Cl. 239, 249 (2008).  A "common type" of substitute contract is one that "contains a term that is inconsistent with a term of an earlier contract between the parties."  *Id.* cmt a.  But the parties must "intend the new contract to replace all of the provisions of the earlier contract. . . ."  *Id.*  Just as the elements of mutual assent and consideration are required for contract formation, a manifestation of mutual assent— whether explicit or implicit— is required to abandon an earlier contract and form a substitute contract.  *Bannum,* 80 Fed. Cl. at 250.  Applying those principles to the text of the 1988 Short-Form Lease, I cannot conclude that the parties intended the Fair Market Value Option to supersede the Fixed Price Option.

Notably, the fair market value formula provided that the 1988 "lease fee value w[ould] *include all options*," rather than replacing the Fixed Price Option.  Doc. 32-17, at 8 ¶ 14-A (emphasis added).  Indeed, the Fair Market Value Option expressly referred back to the Fixed Price Option in multiple ways.  The fair market value formula relied on the Fixed Price Option to set the payment terms for the Main Space, defining the residual value of the Main Space as "the last fixed option purchase price for the original leased space, dated December 2, 1969. . . ."  *Id.*

Moreover, the formula based the residual for the Additional Space (or, as stated in the formula, the "demised premises") on the appraised value of only that space (as stated in the formula, the "lease fee interest," or the portion of the building leased pursuant to the 1988 Short-Form Lease). *Id.* Taken together, the text of the 1988 Short-Form Lease suggests that the parties presumed the Fixed Price Option governed the value of the Main Space and the Fair Market Value Option defined the value of the Additional Space. In other words, the 1988 agreement treated the Fixed Price Option and Fair Market Value Option as coexisting. Thus, construing the plain language of the 1988 Short-Form Lease, I hold that the parties intended the Fair Market Value Option to supplement rather than supplant the Fixed Price Option.

Several courts evaluating analogous facts have concluded that the original option clauses were not superseded. In several cases to which USPS cites, courts have construed what appears to have been identical or nearly-identical 1960's USPS leases and option clauses therein, which were amended in the 1980's by an option to purchase the properties at issue for fair market value any time prior to the termination of the lease. *See, e.g.*, *United States v. Johnson*, 43 F.3d 1308, 1310 (9th Cir. 1994) (enforcing USPS's 1967 fixed-price option to purchase a property and rejecting the building owner's claim that a 1981 fair market value purchase option superseded it); *U.S. Postal Serv. v. Goldsmith,* No. SACV1200177JVSJPRX, 2013 WL 12119571, at *5 (C.D. Cal. Jan. 16, 2013) (enforcing USPS's 1961 fixed-price option to purchase a property and rejecting the building owner's claim that a 1980 fair market value purchase option superseded it); *United States Postal Serv. v. Jamke*, No. I 15CV01806LJOEPG, 2017 WL 131991, at *7 (E.D. Cal. Jan. 12, 2017) (enforcing USPS's 1965 fixed-price option to purchase a property and rejecting the building owner's claim that a 1981 fair market value purchase option superseded it). In those cases, the amendments were expressly "in addition to any other purchase options

available under the lease of this property" and the agreements at issue provided that USPS could exercise the different purchase options at different times. Therefore, the courts determined that the fair market value amendments did not supersede the original options and were, in effect, options in the alternative.

In this case, the same two facts are material. One, as the text of the 1988 Short-Form Lease makes clear, the Fair Market Value Option was in addition to the Fixed Price Option. Two, USPS had the right to exercise the Fixed Price Option and Fair Market Value Option at different times. Under the terms of the 1969 Main Space Lease, USPS could exercise the Fixed Price Option on the day October 31 in the years 1989, 1994, 1999, 2004, 2009, 2014, or 2019. Doc. No. 32-6, at 7 ¶ 18. Under the terms of the 1988 Short-Form Lease, USPS could exercise the Fair Market Value Option on the day October 31 in the years 1989, 1994, or 1999. Doc. No. 32-17, at 7 ¶ 14. On its face, the 1969 Main Space Lease provided additional opportunities to exercise the purchase option. Like in *Johnson*, *Goldsmith*, and *Jamke*, the Fixed Price Option and Fair Market Value Option were options in the alternative.

Accordingly, I hold that the Fair Market Value Option did not supersede the Fixed Price Option. Thus, its expiration in 2000 extinguished the Fair Market Value Option and had no legal effect on the Fixed Price Option.

#### ii. The Fixed Price Option Was Not Extinguished by the 2000 Additional Space Lease

29 Main LLC contends that, even if the Fixed Price Option entitles USPS to the entire property, the Fixed Price Option was extinguished by the language in the 2000 Memorandum to the 2000 Additional Space Lease providing that "there are no purchase options available." *See* 29 Main's Mem. of Law, Doc. No. 33-3, at 9-10. I disagree.

In support of its position, 29 Main LLC cites to *Bechtel Corp. v. Local 215, Laborers' Int'l Union* for the proposition that, when contract terms are inconsistent, courts construing federal law hold that the later provision governs and rescind the earlier provision.  544 F.2d 1207, 1213 (3d Cir. 1976) (describing a substituted contract).  *Bechtel* concerned which of two contracts controlled the resolution of a damages dispute between two AFL-CIO affiliates, an original agreement with a local union or subsequent agreement with the national union.  *Id.* at 1211.  The local agreement excepted both damages claims and jurisdictional disputes from arbitration, whereas the national agreement only excepted jurisdictional disputes. *Id.*  The Third Circuit first addressed whether the provisions conflicted, which it defined as whether they "both cannot be operative at the same time." *Id.* at 1212.  There, the contracts were "fundamentally inconsistent" because they contained contradicting terms regarding arbitrating damages disputes and "each provide[d] for its own superiority." *Id.*  Next, the Third Circuit adopted the Restatement rule that "[a] contract containing a term inconsistent with a term of an earlier contract between the same parties is interpreted as including an agreement to rescind the inconsistent term of the earlier contract." *Id.* at 1213 (citation omitted).  On that basis, the *Bechtel* court concluded that the subsequent national contract had extinguished the damages arbitration provision in the earlier local contract. *Id.* Applying *Bechtel*, 29 Main LLC suggests that the Fixed Price Option was extinguished by the provision of the 2000 Memorandum expressly memorializing that USPS lacked a purchase option for the Additional Space in the 2000 Additional Space Lease.

With regard to the first step, whether the terms were inconsistent, I conclude that the Fixed Price Option and the salient language in the 2000 Memorandum were not inconsistent. As a matter of law, the Fixed Price Option offered to sell the entire subject property.  Therefore, it

was not inconsistent for USPS to lease the Additional Space for a defined term and to do so without a purchase option for that portion of the already-offered subject property.  The lack of a purchase option in the 2000 Additional Space Lease was nothing more, and nothing less, than the lack of an option.  Therefore, it did not directly contradict USPS's extant right to exercise its option to purchase the subject property in fee simple provided by the 1969 Main Space Lease, and the missing option clause in the 2000 Additional Space Lease is not an inconsistent term.

Furthermore, the language in the 2000 Memorandum memorializing that there were no purchase options is of no legal consequence.  The 2000 Memorandum describes the 2000 Additional Space Lease in detail, then memorializes that "[t]here are no purchase options available."  2000 Memorandum, Doc. No. 32-21.  The memorandum exclusively addresses the 2000 Additional Space Lease, and it never once refers to the 1969 Main Space Lease.  I will not read an excluded term (a reference to the 1969 Main Space Lease) into the 2000 Memorandum. *See Rogow*, 150 Conn. at 408 ("A term not expressly included will not be read into a contract unless it arises by necessary implication from the provisions of the instrument.").  Therefore, the logical interpretation of the phrase is that the 2000 Additional Space Lease did not make any purchase options available, and 29 Main LLC's conclusion that the 2000 Memorandum somehow extinguished the Fixed Price Option is unsupported.

Not surprisingly, 29 Main LLC disagrees, pointing to internal USPS communications indicating that USPS acknowledged that only one of the two lease agreements provided for the option. *See* 29 Main LLC's Mem. of Law, Doc. No. 33-3, at 10 (citing Docs. No. 32-23 (Meador letter); 32-24 (1998 negotiations summary); 32-25 (2000 negotiations summary); 32-26 (Senk email); 32-31 (Gardiner email)).  The citation to extrinsic evidence is unavailing.  I have held that the terms of the Fixed Price Option embedded in the 1969 Main Space Lease are

unambiguous.  "[E]xtrinsic evidence . . . may not be considered unless an ambiguity is identified

in the contract language.  Outside evidence," such as the documents the plaintiff attempts to

marshal here, "may not be brought in to create an ambiguity where the language is clear."  *City*

*of Tacoma v. United States*, 31 F.3d 1130, 1134 (Fed. Cir. 1994).  I therefore decline to reach the

extrinsic evidence.

### iii.  The Fixed Price Option Should Not be Rescinded for Mutual Mistake

Building on the same flawed construction, 29 Main LLC further argues that the Fixed

Price Option should be rescinded, asserting that a mutual mistake of fact regarding the

"boundaries of the leased premises" renders the contract impossible to perform because it is "not

legally achievable for [29 Main LLC] to carve up its property, and the building located on it, and

convey a portion of each to [USPS]."  Doc. 33-3, at 14-16 (citing to *U.S. Postal Serv. v. Phelps*

*Dodge Ref. Corp.*, 950 F. Supp. 504, 517 (E.D.N.Y. 1997)).

Mutual mistake occurs when both parties are mistaken regarding an essential element of

the contract.  The adversely affected party may be entitled to void the contract upon a showing of

a mistake of fact at the time the contract was formed, which relates to a basic assumption of the

contract and has a material impact on the transaction; and that the adversely affected party did

not assume the risk of the mistake.  Restatement (Second) of Contracts § 152 (Am. L. Inst.

1981).  Under Connecticut law, a mutual mistake is "common to both parties and effects a result

that neither intended."  *McBurney v. Cirillo*, 276 Conn. 782, 815 (2006).

Here, 29 Main LLC cannot carry the burden of proving mutual mistake because USPS's

desired outcome is the result that the originally contracting parties intended.  At the time the

Fixed Price Option was contracted, as evinced by the terms of the 1969 Main Space Lease and

Fixed Price Option, the Post Office Department and Gold sought to effectuate a sale-leaseback

41

agreement providing USPS a right to repurchase the subject property.  Thus, the specific performance USPS seeks through this lawsuit is consistent with the Post Office Department and Gold's intentions in executing the 1969 Main Space Lease and contracting for the Fixed Price Option.  Therefore, the boundaries of the subject property are as broad as the metes and bounds of the underlying land described in Paragraph 2 of the 1969 Main Space Lease.  Doc. No. 32-6, at 1-2 ¶ 2.  On that basis, there is no need for the plaintiff to "carve up its property" in the first place, and no need for recission.  Accordingly, 29 Main LLC's mutual mistake argument must fail.

Furthermore, even assuming *arguendo* that there had been a mutual mistake, I am not persuaded that recission would be the appropriate remedy.  "Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents . . . , the court may at the request of a party reform the writing to express the agreement. . . ."  Restatement (Second) of Contracts § 155 (1981).  But the bar to establish a right to the "extraordinary" remedies of reformation and recission is high.  *Nat. Australia Bank v. United States*, 452 F.3d 1321, 1329 (Fed. Cir. 2006); *Canfield v. Reynolds*, 631 F.2d 169, 175 (2d Cir. 1980).  Of course, 29 Main LLC does not meet that bar because there does not appear to have been a mutual mistake in the 1969 Main Space Lease.  Nevertheless, assuming *arguendo* that 29 Main LLC is correct that the 1969 Main Space Lease and its Fixed Price Option manifested a mutual mistake, I plainly disagree that 29 Main LLC's sought-after outcome would be appropriate.

Here, as discussed, the Fixed Price Option offered for sale fee simple title to the land and reflected the intended sale-leaseback arrangement of the predecessors in interest.  In my view, then, any ostensible mistake in the Fixed Price Option arises from the inartful phrase "the leased

premises" in defining (if only in part) the subject of the option.  If "the leased premises" language is the source of the rhetorical mismatch and mutual mistake, then it would be more consistent with the contracting parties' overall agreement to reform the phrase "the leased premises" than to rescind the contract altogether.  I refer back to *Texas Co.*, wherein the Connecticut Supreme Court observed that the plaintiff had not obtained "an unconscionable advantage by reason of any mistake of the parties concerning the definiteness of the original option" because "[w]hat it received under [its] agreement was no more than it was justly entitled to by reason of the actual agreement between it and the lessors."  *Texas Co.*, 137 Conn. at 226. In such circumstances, this Court "would not do equity if it permitted the defendant to avoid its liability . . . on the ground that it did not know that the [Fixed Price Option] was ambiguous in its description of the land which the parties to that option really intended to describe."  *Id.*

To be clear, I do not order reformation.  I merely observe that if the parties to the Fixed Price Option intended the arrangement most consistent with their original agreement, the superior remedy would be to effectuate their intent rather than rescinding the agreement.

### iv.  The Fixed Price Option Should Not Be Rescinded for Unilateral Mistake

In a similar vein, 29 Main LLC further argues that when the parties agreed to the 2000 Additional Space Lease, they agreed that there were no purchase options available, that both parties had agreed to extinguish the Fixed Price Option, and that 29 Main LLC unilaterally misunderstood that arrangement.  Doc. 33-3, at 16-17.  I am not persuaded.

When only one party was mistaken regarding an essential element of a contract at the time of its formation, the mistaken party may void the contract if the mistaken party does not bear the risk of the mistake and (1) the mistake makes enforcement of the contract

unconscionable, or (2) the other party had reason to know of the mistake or his fault caused the mistake.  Restatement (Second) of Contracts § 153 (Am. L. Inst. 1981).

Here, 29 Main LLC cannot carry its burden of establishing that its unilateral mistake warrants recission.  As I understand it, 29 Main LLC seeks to rescind a provision of one agreement (the 1969 Main Space Lease) based on its unilateral mistake regarding another agreement (the 2000 Additional Space Lease).  For this proposition, 29 Main LLC does not marshal any authority.  I presume that it cannot, because the doctrine of unilateral mistake governs contacts at the time of their formation.  Thus, 29 Main Space LLC's predecessor in interest needed to have been mistaken about the 1969 Main Space Lease to justify rescinding the Fixed Price Option now.  But, for the reasons I have already addressed, there does not appear to have been a mistake at the time the predecessors in interest contracted the 1969 Main Space Lease and Fixed Price Option.  Therefore, 29 Main LLC cannot establish a unilateral mistake regarding the contract containing the provision it seeks to rescind.

Moreover, 29 Main LLC makes no showing regarding the two special conditions for unilateral mistake.  First, 29 Main LLC does not show unconscionability.  There was no absence of meaningful choice, because Gold had extensive experience negotiating with the government through his ownership of multiple post offices. There is no allegation that USPS benefitted from unreasonably favorable contract terms in 1969, an issue 29 Main LLC thereby appears to waive.  And although I appreciate that 29 Main LLC's appraisal report concludes that the contemporary value of the subject property is $1,460,000, far greater than the Fixed Price Option's purchase price of $300,000, the contemporary appraisal is irrelevant.  Appraisal, Doc. No. 38-1, at 7.  Unconscionability is assessed at the time the contract is made.

Second, 29 Main LLC does not make a sufficient showing that the Post Office Department had reason to know of a mistake or caused a mistake at the time the 1969 Main Space Lease was contracted.  Rather, as I have explained, reading the 1969 Main Space Lease as a whole and the 1969 Agreement to Lease expressly incorporated by reference therein, Gold and the Post Office Department appear to have agreed to an arrangement providing an option to repurchase the property.

Accordingly, 29 Main LLC cannot establish that its unilateral mistake in the 2000 Additional Space Lease warrants recission of a provision of the 1969 Main Space Lease.

### v.   The Fixed Price Option is Not Void Under the Statute of Frauds

Somewhat duplicatively, 29 Main LLC further argues that the contract is invalid because its terms are insufficiently definite to pass muster under the Connecticut Statute of Frauds. Specifically, it argues, the parties are "unable to distinguish the exempt portion of the premises from the remainder of the premises."  Doc. No. 33-3, at 18-21.  This argument must fail.

The Connecticut Statute of Frauds forbids the enforcement of land sale contracts unless the agreement, or a memorandum of agreement, is made in writing.  Conn. Gen. Stat. § 52-550. The writing must be sufficiently definite.  That is especially true with respect to a sale of real property excluding a portion of the property, because if "the description of the excepted parcel in the option to purchase is palpably uncertain and indefinite, the result is that the general description of the land to be conveyed is uncertain and indefinite."  *Montanaro Bros. Builders v. Snow*, 190 Conn. 481, 486 (1983) (cleaned up).

In support of its argument, 29 Main LLC relies on *Montanaro Brothers Builders v. Snow*, in which farm owners made an oral deal (later memorialized in a signed writing) for an option to convey a seventy-three acre estate to developers, with the exception of the "milk distribution

area," the owner's home, and one six-acre portion to be "delineate[d]" later.  *Id.* at 483.  The

Connecticut Supreme Court affirmed the trial court's conclusion that there was "no way to

ascertain" the excepted portion and, thus, the description of the retained portion of the property

was too uncertain to be enforceable.  *Id.* at 484.  In other words, the Court determined that

agreement failed to "reasonably identif[y] the subject matter of the contract."  *Id.* at 486.

Here, the Statute of Frauds argument fails for the same reason as the others before it; if

the Fixed Price Option offers for sale both the land and its edifice, then it encompasses the entire

property and no portion of the property is exempt from the offer to sell it.  Without the need for

the Fixed Price Option to distinguish the premises leased pursuant to the 1969 Main Space Lease

from the portion of the property exempted by it, 29 Main LLC's concern regarding contractual

indefiniteness is inapposite.

### d.   The 1969 Fixed Price Option Constitutes A Valid Option Contract

Taken together, USPS has established: (1) mutuality of intent to contract, (2) a lack of

ambiguity in the offer, and (3) valid consideration.  Accordingly, it has established a valid option

contract that will be binding upon proper exercise by a representative of the government with

actual authority to accept it.

### 2.   *USPS Substantially Performed Its Share of the Contract*

USPS has established the second prong required for specific performance, substantial

performance of its share of the contract, because USPS undisputedly complied with the terms of

its leases and the requirements of the Fixed Price Option.

First, there is no dispute that USPS complied with the terms of its leases with Gold and

his successors.  *See, e.g.,* Doc. No. 38-2, at 15 ¶ 46.

46

Second, to have validly exercised the Fixed Price Option, USPS must have "exercise[d] the option in exact accord with the terms of the contract," *Arko Exec. Servs., Inc.*, 553 F.3d at 1379, and there is no dispute that USPS exactly complied with the terms necessary to exercise the Fixed Price Option.

USPS properly complied with the notice term.  The 1969 Main Space Lease provided that "the Government shall give the Lessor notice of election to purchase at least one year in advance of the respective times set out next above."  Doc. No. 32-6, at 7 ¶ 18.  One of the opportunities to exercise the option provided in Paragraph 18 was the end of the sixth five-year renewal term, or October 31, 2019.  *Id.*  Thus, to have exercised the Fixed Price Option in a timely manner, USPS must have given notice of exercise by October 31, 2018.  Here, USPS undisputedly complied with the notice requirement by sending 29 Main LLC notice of exercise of the Fixed Price Option on October 19, 2018, twelve days before the deadline.  Notice of Exercise of Option, Doc. No. 32-27; Doc. No. 38-2, at 16 ¶ 51.

Moreover, the notice was sent by Lowe, an authorized contracting officer with the authority to spend the amount of the purchase price.  Lowe Decl., Doc. 34-4, at 2 ¶ 3 (swearing that he could expend up to $5,000,000); Doc. No. 34-5; *see also Anderson v. United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003) (the final element for a contract binding on the government is that the government's contracting representative had "actual authority to bind the United States in contract").

An actual agent validly exercised the option.  As a result, USPS's notice constituted an acceptance of 29 Main LLC's continuing offer to sell fee simple title to the subject property at the fixed price, thus completing the bilateral contract of sale effective October 18, 2018.  At that point, the Fixed Price Option became an enforceable contract binding on 29 Main LLC.

47

Third, USPS complied with the "respective times and prices" set forth in the Fixed Price Option.  Doc. No. 32-6, at 7 ¶ 18.  At the end of the sixth five-year renewal option term, the respective price for the subject property was $300,000.  *Id.*  Thus, to have properly tendered the purchase price, USPS must have tendered $300,000.  Here, USPS complied with its obligation to tender the purchase price of $300,000.  USPS agent Lowe wired $325,000, the purchase price plus closing costs, to escrow agent Chicago Title and Trust for closing.  USPS's Rule 56 Stmt., Doc. No. 34-2 ¶¶ 55-56.  The record corroborates the wire transfer.  Doc. No. 34-13.

USPS complied with the terms of the lease agreements, properly gave notice, and properly tendered payment in exact accord with the terms of the 1969 Main Space Lease. Accordingly, there is no genuine dispute that USPS substantially performed its share of the agreement and that USPS has satisfied the second prong required for specific performance.

### 3.  *The Parties Are Able to Continue Performing*

USPS asserts that it is ready, willing, and able to exercise the Fixed Price Option.  The only arguments raised by 29 Main LLC to suggest otherwise repeat that the option is impossible to perform and should be rescinded for mistake, arguments I have already found unavailing.  I agree that USPS has established the third prong required for specific performance, because the parties can continue performing the Fixed Price Option.

### a.  USPS Can Continue Performing

USPS's funds for the purchase price and closing costs remain in escrow, so there is no genuine dispute that USPS is ready, able, and willing to perform.  USPS's Rule 56 Stmt., Doc. No. 34-2, at 10 ¶ 59; Lowe Decl., Doc. No. 34-4, at 9 ¶ 32.

48

b.  29 Main LLC Can Continue Performing, Because the Conveyance Is Not
Impossible

Once again, 29 Main LLC argues that the option is impossible to perform, because the

Fixed Price Option provides an option to purchase fee simple title only to "the leased premises,"

the Main Space, and 29 Main LLC cannot convey the leased premises without also conveying

the Additional Space.  Doc. No. 33-3, at 10-14.  However, as I have explained, I disagree with 29

Main LLC's construction of subject of the Fixed Price Option; the Fixed Price Option offers to

sell the entire subject property, including the entire building.  That offer became binding upon

USPS's proper exercise of the option.  Therefore, 29 Main LLC need not convey only the share

of the property leased through the 1969 Main Space Lease, and I need not reach the question

whether a partial conveyance is impossible.

4.  *USPS Is Entitled to Setoff Its Holdover Rental Payments*

An entity that validly exercises an option and properly tenders the option purchase price

has "duly performed all of the conditions to be performed on its part, and as of that date

bec[o]me[s] the equitable owner of the property."  *Heyman*, 178 Conn. at 220.  An equitable

owner of real property is entitled to discharge of its responsibility to provide additional rental

payments, *id*. at 224, and holdover rental payments should be treated as setoff against the

purchase price of the property, *State v. Lex Assocs*., 248 Conn. 612, 621 (1999).   As an equitable

owner, then, USPS is entitled to setoff its holdover rental payments.

Specifically, in *Lex Associates*, the State of Connecticut executed a lease agreement with

a purchase option for the subject property with the defendant lessor's predecessor-in-title.  *Id*. at

615.  The state subsequently notified the lessor of its intent to exercise the option.  *Id*. at 616.

However, although the state attended the scheduled closing and tendered the purchase price set

forth in the purchase option, the lessor neither attended the closing nor accepted the tender.  *Id.*

49

The Connecticut Supreme Court affirmed the trial court's grant of summary judgment, specific performance, and application of post-closing rental payments made *pende lite* as setoff for the purchase price. *Id.* at 617.

Here, after both leases expired in 2019, USPS remained a holdover tenant while its funds for the purchase price remained in escrow. The record is clear that USPS continued to tender rental payments in the interim. Doc. No. 34-14. But, after USPS validly exercised the Fixed Price Purchase option and properly tendered payment, it became the equitable owner of the subject property.

Accordingly, USPS is entitled to reallocate its post-closing rental payments as setoff against the $300,000 purchase price set by the Fixed Price Option.

## IV. Conclusion

In sum, I **deny** summary judgment to 29 Main Street, LLC and **grant** summary judgment to the United States Postal Service. I enter final judgment in favor of USPS on each of its counterclaims and dismiss 29 Main Street, LLC's claims against USPS with prejudice.

I award USPS the specific performance it seeks, and I order that:

1. 29 Main LLC shall complete the closing and transfer of all right, title, and interest in the subject property to USPS within thirty days after the entry of judgment in this case (the "Closing Date"), on the terms and conditions set forth below, in exchange for $300,000 (minus credits of $98,000 received by 29 Main LLC), which sum has been deposited in escrow by USPS.

2. No later than five business days before the Closing Date, 29 Main LCC shall submit to the USPS a draft deed of conveyance to vest fee simple title to the property in the USPS that is

good and marketable whereby such deeds are insurable at customary rates and sufficient to meet all recording requirements in the Town of New Milford, Connecticut.

3.  No later than five business days before the Closing Date, 29 Main LLC shall submit all documents required by the title company or closing agent selected by the USPS (the "Closing Agent") to complete the closing of the sale of the property to USPS and to vest fee simple title in the USPS that is good and marketable, and insurable at customary rates.  29 Main LLC shall cooperate with the Closing Agent to the extent the Closing Agent identifies any other documents or actions necessary to transfer such fee simple title that is good and marketable, and insurable to the USPS on the Closing Date.

4.  After title is conveyed in accordance the judgment in this case, fee simple title shall be deemed, by the judgment, to have vested in USPS as of October 31, 2019, the date that conveyance of the property to USPS would have occurred but for 29 Main Street, LLC's default and 29 Main Street, LLC, including its predecessors in interest, shall be deemed to have no rights, title or interest in the property as of such date.  The judgment ordering specific performance may be recorded in the official records of the Town of New Milford, Connecticut.

5.  29 Main LLC shall pay such costs or take such actions as may be required by the Closing Agent to convey fee simple title to the property to USPS on the Closing Date free and clear of: (a) any taxes or assessments, whether or not shown as existing liens as of the Closing Date by the records of any taxing authority or by the Public Records; (b) any rights, interest or claims of third parties to the property; and (c) any and all other liens or encumbrances, defects, adverse claims or other matters.

6.  In the event 29 Main LLC fails to make payments as required by item 5 above, then USPS may deduct the amounts necessary to remove such taxes, liens and encumbrances from the

purchase price otherwise due under the provisions of the lease.   The Closing Agent is directed to allow these deductions from the purchase price in accordance with this order.

7.  29 Main LLC is liable for any costs caused by its failure to abide by the order of specific performance in the judgment, including, without limitation court costs and legal fees that may be incurred by USPS to enforce it.

8.  Notwithstanding entry of final judgment, the Court shall retain jurisdiction to enforce its orders in this case.

The Clerk is directed to enter judgment and close this case.

So ordered.

Dated at Bridgeport, Connecticut, this 31st day of March 2022.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge